**STATE of Minnesota, Petitioner, Appellant,**

v.

**Kevin Clayton BLACKSTEN, Respondent.**

**No. C0–92–621.**

Supreme Court of Minnesota.

Nov. 5, 1993.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, James A. Terwedo, Scott County Atty., Thomas J. Harbison, First Asst. County Atty., Neil Nelson, Asst. County Atty., Shakopee, for petitioner, appellant.

John M. Stuart, MN Public Defender, Mark D. Nyvold, Sp. Asst. Public Defender, St. Paul, for respondent.

## OPINION

WAHL, Justice.

This is a pre-trial criminal appeal by the state [1] from a decision of the court of appeals affirming the trial court's conclusion that the detention of respondent Kevin Clayton Blacksten was illegal because it "exceeded the permissible length of an investigative stop, occurred far from where the search warrant was to be executed, and began long before the warrant was approved." *State v. Blacksten*, 489 N.W.2d 252, 255 (Minn.App. 1992). We affirm in part, reverse in part and reinstate the judgment of dismissal.

On January 27, 1992, respondent was charged by complaint in Scott County with aggravated robbery in violation of Minn.Stat. §§ 609.245; 609.11, subd. 5; and 609.05. The facts, as found by the trial court at the omnibus hearing held March 4, 1992, are as follows:

At approximately 10:00 p.m. on January 21, 1992, two persons wearing ski masks and helmets, one carrying a sawed-off shotgun, robbed the FinaMart in New Prague, Minnesota. A citizen informed police that he had seen two people and a Polaris Indy snowmobile outside the FinaMart shortly before the robbery occurred. Investigating officers found two sets of footprints in the snow in this area, one made by cowboy boots, the other by tennis shoes. The officers, following a snowmobile track from the FinaMart, discovered an abandoned Polaris Indy snowmobile some distance away which was later determined to have been stolen on or about January 20.

On January 23, 1992, an informant told New Prague police that, on the evening of January 21, he had seen what he believed to be a green Ford Pinto, license number 785 GCX, parked in the area where the stolen snowmobile was later found. After transposing the G and C in the license number, a check of 785 CGX came back registered to a green Pinto wagon owned by Jim Otis. Dakota County officers located the vehicle, in which they observed helmets and other items in plain view, in Burnsville. Otis was subsequently arrested while driving the Pinto.

Jill Helmer was in the car with Otis at the time of his arrest. In her purse was a bottle of pills prescribed for respondent. Helmer told police that Otis and respondent were friends, that the two men had been together late in the morning of January 21, 1992, and that Otis had not come home until approximately 5:00 a.m. on January 22. A detective with the Scott County Sheriff's Office was

1. Pursuant to Minn.R.Crim.P. 28.04.

informed by a Rice County detective that Otis and respondent had committed an armed robbery using a snowmobile in Rice County in 1985.

At approximately 5:30 p.m. on January 23, Scott County investigator David Menden was watching respondent's house while other officers were attempting to obtain a search warrant for that residence. At about 6:00 p.m., Menden saw respondent leave the house, get into a car, and drive away. Menden and a fellow officer followed for two miles, then stopped respondent's car as it pulled into a gas station. Respondent had committed no traffic violations, his vehicle's registration was current, and he had proper proof of insurance; Menden later testified that he stopped respondent's car solely because of safety concerns related to the anticipated search of respondent's residence. In fact, the search warrant was not signed until at least one hour and fifteen minutes after respondent was stopped by Menden.

After stopping respondent's car, Menden pointed a shotgun at him, ordered him to get out of the car and lie on the ground, and searched him. Before placing him in the back of the squad car, Menden handcuffed respondent's left hand to his rear belt loop because his right hand was in a cast. He gave respondent no *Miranda* warning.

Menden at first refused to answer respondent's inquiries as to why he was being held, saying that other officers would be able to explain. Eventually, Menden told respondent that the police were planning to search his residence in connection with the armed robbery of the FinaMart. Respondent raised his right arm and asked how he could have done it with his arm in a cast. After some period of time, Menden told respondent that he would like to search respondent's vehicle and had him sign a consent form. Menden discovered in the car, but not in plain view, a Polaris snowmobile cover and had respondent sign the consent form again beneath a sentence giving him permission to take the cover. As Menden would later testify, at no time was respondent free to leave.

At approximately 7:30 p.m., officers arrived at respondent's home with a signed search warrant. A Scott County detective left the residence and went to where respondent was being held. There, the detective looked at the bottom of respondent's shoes and identified their tread pattern as being similar to his recollection of the tread pattern of the shoe print photographed at the FinaMart. Respondent was then informed that he was under arrest.

On February 6, while respondent was still being held in the Scott County jail, New Prague police executed a search warrant for samples of respondent's head and facial hair.

At the omnibus hearing, Kelly Odean testified that respondent was with her during the entire evening of January 21, 1992. Respondent testified that he had had the cast on his right arm since early January and that he had not committed any crimes with Otis in Rice County using a snowmobile. He further testified that, while being held in the squad car, Menden repeatedly told him he would do best to cooperate and that he had signed the consent form without reading it.

The trial court concluded (1) that no articulable suspicion to stop respondent's car existed; (2) that respondent was seized for purposes of the fourth amendment; (3) that probable cause did not exist at the time respondent was seized; (4) that the seizure was unjustified and unreasonable under the circumstances; (5) that respondent did not voluntarily consent to the search of his car; (6) that the evidence obtained as the direct result of the unlawful arrest—respondent's statement, the snowmobile cover, the tread pattern of his shoes, and the hair samples—must be suppressed as fruit of the poisonous tree; and (7) that probable cause to believe respondent committed the alleged crime does not exist. The trial court suppressed the tainted evidence and granted respondent's motion to dismiss for lack of probable cause.

The court of appeals, on the state's appeal, held that while there was articulable suspicion to justify the stop, the stop exceeded the permissible duration under the circumstances and so the trial court did not err in finding it illegal. The statement and the shoe tread evidence were held properly suppressed. Because the court of appeals remanded for additional findings on the issue of the con-

sent to search the car, the suppressibility of the snowmobile cover was held in abeyance. The hair samples obtained by court order were held admissible. The trial court, on remand, was to reassess probable cause.

The issue before us is whether the court of appeals erred in holding that the continued detention of respondent two miles from the scene of the anticipated execution of a search warrant, begun at least seventy-five minutes before the warrant was signed, was illegal.

■ The state, to obtain reversal of the order, must demonstrate clearly and un-equivocally that the trial court erred in its judgment and that the error, left unreversed, will have a critical impact on the outcome of the trial. *State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977). Because the parties agree that the trial court's order will have a critical impact on the trial, the issue then becomes whether the state has clearly and unequivocally shown that the trial court erred. The state attempts to make this showing by first arguing that, where the suspect was held in a squad car by the side of the road while a search warrant was being sought, the length of the investigative stop was within the permissible limits of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ An investigative stop may be made on any articulable suspicion as long as it is not "the product of mere whim, caprice or idle curiosity." *State v. Combs*, 398 N.W.2d 563, 566 (Minn.1987) (citations omitted). The police here had an articulable suspicion of respondent's involvement with the armed robbery in that they were aware that respondent associated with Otis and had spent some part of the day of the robbery with him, and they knew that Otis, who had a prior record of robbery, had been arrested for the Fina-Mart robbery. They also knew that a warrant for a search of respondent's residence and person was being sought. Because the police had an articulable suspicion that respondent had been involved in a completed felony, the court of appeals correctly held that the officers could lawfully make a *Terry* stop to investigate that suspicion. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

■ Although the initial stop was legal, we must still ask whether the scope of the detention exceeded constitutional limits. Neither the cases of the United States Supreme Court nor of this court have imposed a rigid time limitation on the duration of *Terry* stops. The general rule is that the detention of the person stopped may not continue indefinitely but only as long as reasonably necessary to effectuate the purpose of the stop. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Sharpe* the Court said,

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*Id.* at 686. In *State v. Moffatt*, 450 N.W.2d 116 (Minn.1990), this court held one hour not too long a time of detention where three suspects were stopped within two blocks of a burglary in the middle of the night with no other cars around, reasonable suspicion was not dispelled, and the officers acted reasonably and diligently under the circumstances.

■ Here, Officer Menden, who stopped respondent, had no intention of conducting any investigation while detaining him. As the trial court found, the stop was not a reasonable pre-arrest detention intended to freeze the scene so that an investigation could be made; it was an arrest. Respondent was seized two miles from his residence at least an hour and fifteen minutes prior to the issuance of the search warrant for that residence. Respondent was under arrest from the time he was ordered to the ground at gunpoint, handcuffed, and put in the squad car. No reasonable person would have believed that he or she was free to leave under these circumstances, *see Kirsch v. Commissioner of Public Safety*, 440 N.W.2d 147, 149 (Minn.App.1989), and, indeed, Officer Menden testified that respondent was not free to leave.

■ The state argues that the continued detention was justified by the existence of

exigent circumstances and, further, that the seizure of respondent by Officer Menden was proper when other officers were in the process of getting the warrant signed to search respondent's residence and his person and respondent had just left the house. We find no exigent circumstances and although it is permissible to detain a person during the execution of a search warrant when that person is present at the scene, *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), there is no authority for detaining a person under the circumstances in this case and we decline to thus extend the limits of a *Terry* stop. We hold that the detention of respondent two miles from his residence for well over an hour while the search warrant was being sought was not a reasonable pre-arrest investigatory stop.

█ Respondent was de facto under arrest from the time he was ordered to the ground at gunpoint, handcuffed, and placed in the squad car. While a warrantless seizure of respondent's person would have been justified had probable cause for arrest existed at the time of the seizure, the state has failed to show clearly and unequivocally that the trial court erred in concluding that probable cause for arrest did not exist at the time respondent was seized. *See United States v. Bazinet*, 462 F.2d 982 (8th Cir.1972). Respondent's mere association with Otis does not constitute probable cause for respondent's arrest. *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); 2 W. LaFave, Search & Seizure § 3.6(c) (1987). Nor do the facts beyond respondent's mere association with Otis provide probable cause for believing respondent committed the Fina-Mart robbery. Otis' girlfriend Helmer told police that Otis and respondent were together at noon on January 21, but this was ten hours before the robbery. The fact that respondent fit the general description given by the clerks who witnessed the January 21 robbery is of little value since the robbers were wearing ski masks and helmets. The robbery which was the basis for respondent's prior arrest and conviction for armed robbery in Rice County had taken place seven years prior to respondent's arrest in this case, *see Commonwealth v. Allen*, 406 Mass. 575, 549 N.E.2d 430 (1990) (defendant's four-year-old conviction of marijuana possession not sufficiently recent to be factored into a probable cause determination for a drug offense) and it did not involve collaboration with Otis nor did it involve the use of a snowmobile as a modus operandi. Finally, the fact that the police had information that the respondent was seen in Otis' company trying to buy a gun is of little value where the police were not informed as to when the two were seen together or as to the reliability of the informant. The court of appeals properly upheld the trial court's suppression of the fruits of the illegal arrest.

· █ We reverse the court of appeals, however, on the issue of whether consent to search respondent's vehicle was given voluntarily. The court of appeals remanded the consent issue for additional factual findings on the ground that there was conflicting testimony as to how respondent's consent was obtained. In our view, consent is a credibility issue. The trial judge heard the conflicting testimony, observed the witnesses, and chose to believe respondent. We affirm the trial court's finding that respondent did not voluntarily consent to the search of his vehicle. With evidence of the snowmobile cover suppressed and with no showing by the state that the hair samples, even if legally obtained, in any way connected respondent to the FinaMart robbery, the trial court properly granted respondent's motion to dismiss for lack of probable cause.

Affirmed in part; reversed in part; judgment of dismissal reinstated.